**No. 24-12809**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

Ramnarine Boodoo,

*Plaintiff-Appellant*

v.

Lifepoint Health Inc., et al.

*Defendants-Appellees*

Appeal from the United States District Court
for the Northern District of Alabama

No. 2:21-cv-00569

---

# APPELLANT'S OPENING BRIEF

---

Benjamin P. Bucy
Chloé M. Chetta
Aaron M. Steeg
BARRASSO USDIN KUPPERMAN
FREEMAN & SARVER, L.L.C.
909 Poydras Street, Ste. 2350
New Orleans, Louisiana 70112
(504) 589-9700
bbucy@barrassousdin.com
cchetta@barrassousdin.com
asteeg@barrassousdin.com

James F. Barger, Jr.
J. Elliott Walthall
FROHSIN BARGER & WALTHALL
100 Main Street
Saint Simons Island, Georgia 31522
(205) 933-4006
jim@frohsinbarger.com
elliott@frohsinbarger.com

*Attorneys for Appellant Ramnarine Boodoo*

No. 24-12809, *Boodoo v. Lifepoint Health Inc.*

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, the undersigned counsel of record verifies that the persons and entities listed below have or may have an interest in the outcome of this case:

- Alabama Psychiatry, LLC
- Axon, Annemarie Carney
- Barger, Jr., James Frederick
- Barrasso Usdin Kupperman Freeman & Sarver, LLC
- Bass Berry & Sims, PLC
- Boodoo, Ramnarine
- Bucy, Benjamin Patterson
- Chetta, Chloé Marie
- Curley, Matthew M.
- DSB Acquisition LLC
- Eason, John C.
- Escalona, Prim F.
- Frohsin & Barger LLC
- Grizzle, Anna Minor
- Guidry, Kansas
- Jamie A. Johnston, PC

- Johnson, Stephanie F.
- Johnston, Jamie Austin
- Jones Walker, LLP
- Kamath, Mithun
- King & Spalding LLP
- Lee, Brandy M.
- Lee Law Firm LLC
- Lifepoint Health Inc.
- Long, III, Don B.
- Martin, Daniel J.
- Paulhus, Michael E.
- Prime Healthcare Services-Gadsden, LLC
- Prime Healthcare Services Inc.
- RCHP-Florence LLC d/b/a Shoals Hospital
- Regional Care Hospital Partners, LLC
- Richardson, Clinton
- River Region Psychiatry Associates, LLC
- Riverview Regional Medical Center LLC
- Steeg, Aaron M.
- United States of America
- Walthall, James Elliott

- Wilkerson, Andrew D.
- Yalamanchili, Shankar B.

The undersigned counsel of record verifies that no publicly traded company or corporation has an interest in the outcome of this case.

## STATEMENT REGARDING ORAL ARGUMENT

Dr. Ramnarine Boodoo respectfully requests oral argument. This appeal asks the Court to decide important and complex questions about liability under the False Claims Act and the application of Federal Rule of Civil Procedure 9(b)'s standard for pleading fraud. For these reasons, oral argument is likely to significantly aid the Court's decisional process.

**TABLE OF CONTENTS**


Certificate of Interested Persons and Corporate Disclosure Statement................C-1

Statement Regarding Oral Argument........................................................ i

Table of Contents ........................................................................ ii

Table of Citations .........................................................................v

Jurisdictional Statement ................................................................. ix

Statement of the Issues.....................................................................1

1. Whether a complaint plausibly states False Claims Act violations with the specificity required by Federal Rule of Civil Procedure 9(b) when, based on the Plaintiff-Relator's personal knowledge and experience as an attending physician, it details Defendants' scheme to defraud Medicare, identifies two publicly available year-end Medicare claims that falsely certified compliance with Medicare regulations, and describes the services provided to and Medicare claims submitted for three patients who Plaintiff-Relator personally cared for and who were fraudulently certified and admitted for inpatient psychiatric care.

2. Whether the district court erroneously concluded that the company listed as a counterparty to Plaintiff-Relator's employment agreement and the individual who owns that company, signed the employment agreement, and directly supervised Plaintiff-Relator nonetheless had no direct employment relationship with the Plaintiff-Relator and thus were legally incapable of retaliating against the Plaintiff-Relator in employment.

Introduction...................................................................................2

Statement of the Case.......................................................................4

I. The False Claims Act.....................................................................4

II. Factual Background .....................................................................5

III. Procedural History .....................................................................9

IV. Standard of Review....................................................................13

Summary of the Argument ....................................................................15

Argument....................................................................................17

I. Dr. Boodoo plausibly and specifically pled false claims in the form of annual cost-reports and bills for three patients' services, but the district court erroneously held that the cost reports were not "claims" for purposes of the False Claims Act. ....................................................17

A. Riverview Regional Medical Center's 2018 and 2019 Form 2552 cost reports were legally false claims. ......................................18

B. The Medicare submissions for Patient D, Patient E, and Patient F were also false claims. ...........................................................21

II. Based on these legally and factually false claims, Dr. Boodoo plausibly and specifically pled submission of false claims, use of false statements, reverse false claims, and conspiracy in violation of the False Claims Act. ..24

A. Dr. Boodoo plausibly established the submission of false claims, in violation of § 3729(a)(1)(A), with specificity.....................................26

1. Materiality....................................................................27

2. Presentment..................................................................28

a. The annual cost reports were submitted to Medicare.................29

b. The individual-patient claims were submitted to Medicare........30

3. Causation ....................................................................35

4. Scienter ......................................................................37

B. Dr. Boodoo plausibly established the use of false statements, in violation of § 3729(a)(1)(B), with specificity......................................38

C. Dr. Boodoo plausibly established a reverse false claim, in violation of § 3729(a)(1)(G), with specificity...............................................40

D. Dr. Boodoo plausibly established a conspiracy, in violation of § 3729(a)(1)(C), with specificity. ................................................42

III. Dr. Boodoo plausibly and specifically pled retaliation against River Region and Dr. Yalamanchili. ....44

Conclusion ....47

Certificate of Compliance ....48

Certificate of Service ....48

## TABLE OF CITATIONS

### Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 14

*Cook Cnty., Ill. v. United States ex rel. Chandler*,
538 U.S. 119 (2003) .......... 33

*Gose v. Native Am. Servs. Corp.*,
109 F.4th 1297 (11th Cir. 2024) .......... 4, 5, 39, 42

*Harrison v. Westinghouse Savannah River Co.*,
176 F.3d 776 (4th Cir. 1999) .......... 17

*Hill v. Morehouse Med. Assocs., Inc.*,
2003 WL 22019936 (11th Cir. Aug. 15, 2003) .......... 32, 35

*Hopper v. Solvay Pharms., Inc.*,
588 F.3d 1318 (11th Cir. 2009) .......... 33, 39

*Hubbard v. United States*,
514 U.S. 695 (1995) .......... 17

*Lozman v. City of Riviera Beach, Fla.*,
713 F.3d 1066 (11th Cir. 2013) .......... 45

*Lyes v. City of Riviera Beach*,
166 F.3d 1332 (11th Cir. 1999) .......... 46

*McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc.*,
423 F.3d 1256 (11th Cir. 2005) .......... 28

*Mruz v. Caring, Inc.*,
991 F. Supp. 701 (D.N.J. 1998) .......... 46

*Peppers v. Cobb Cnty.*,
835 F.3d 1289 (11th Cir. 2016) .......... 45

*Pouyeh v. Public Health Tr. of Jackson Health System*,
832 F. App'x 616 (11th Cir. 2020) .......... 25

*R.S.B. Ventures, Inc. v. F.D.I.C.*,
514 F. App'x 853 (11th Cir. 2013) .......... 29

*Ruckh v. Salus Rehab., LLC*,
963 F.3d 1089 (11th Cir. 2020) .......... *passim*

*Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*,
904 F.3d 1197 (11th Cir. 2018) .......... 13

*United States ex rel. Atkins v. McInteer*,
470 F.3d 1350 (11th Cir. 2006) .......... 33

*United States ex rel. Clausen v. Lab'y Corp. of Am.*,
290 F.3d 1301 (11th Cir. 2002) .......... *passim*

*United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*,
591 F. App'x 693 (11th Cir. 2014) .......... *passim*

*United States ex rel. Matheny v. Medco Health Sols., Inc.*,
671 F.3d 1217 (11th Cir. 2012) .......... *passim*

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
857 F.3d 1148 (11th Cir. 2017) .......... 26, 37, 39

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023) .......... 5

*United States ex rel. Quartararo v. Cath. Health Sys. of Long Island Inc.*,
84 F.4th 126 (2d Cir. 2023) .......... 17

*United States ex rel. Rubar v. Hayner Hoyt Corp.*,
306 F. Supp. 3d 478 (N.D.N.Y. 2018) .......... 46

*United States ex rel. Sheppard v. Pathway of Baldwin Cnty., LLC*,
2024 WL 3378386 (S.D. Ala. July 11, 2024)........................................................ 45

*United States v. Bourseau*,
531 F.3d 1159 (9th Cir. 2008) ........................................................................ 19, 21

*United States v. HPC Healthcare, Inc.*,
723 F. App'x 783 (11th Cir. 2018) ........................................................................ 43

*United States v. Kindred Healthcare, Inc.*,
469 F. Supp. 3d 431 (E.D. Pa. 2020)........................................................................ 29

*United States v. Neifert-White*,
390 U.S. 228 (1968) ........................................................................................ 19

*Urquilla-Diaz v. Kaplan Univ.*,
780 F.3d 1039 (11th Cir. 2015) ........................................................ 13, 14, 27, 31

*Virgo v. Riviera Beach Assocs.*,
30 F.3d 1350 (11th Cir. 1994) ........................................................................ 46

*Yates v. Pinellas Hematology & Oncology, P.A.*,
21 F.4th 1288 (11th Cir. 2021) ........................................................ 5, 17, 18, 39

**Statutes**

31 U.S.C. § 3729 ........................................................................................*passim*

42 U.S.C. § 1320a-7b........................................................................................ 20

42 U.S.C. § 1320a-7k........................................................................................ 42

**Rules**

Fed. R. App. P. 60(b)........................................................................................ 13

Fed. R. Civ. P. 8........................................................................................ 13, 14

Fed. R. Civ. P. 9(b) ........................................................................................*passim*

Fed. R. Civ. P. 12(b)(6) .......... 13

Fed. R. Civ. P. 21 .......... 12

Fed. R. Civ. P. 41 .......... 13

Fed. R. Evid. 201 .......... 45

**Regulations**

42 C.F.R. § 405.1803 .......... 19

42 C.F.R. § 412.25 .......... 7, 20, 27

42 C.F.R. § 412.27 .......... 7, 20, 28

42 C.F.R. § 413.20 .......... 29

42 C.F.R. § 413.24 .......... 29

42 C.F.R. § 413.60 .......... 19

**Other Authorities**

5 Charles A. Wright et al., *Federal Practice & Procedure* § 1241 (4th ed.) .......... 14

John T. Boese, *Civil False Claims and Qui Tam Actions* § 2.01(F) (4th ed. 2011) .......... 43

## JURISDICTIONAL STATEMENT

The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) because this case arises under federal law, specifically the False Claims Act, 31 U.S.C. § 3729 et seq., and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

As explained in Dr. Boodoo's Response to Jurisdictional Question, the Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on August 29, 2024 (Doc. 85), and Dr. Boodoo timely filed his notice of appeal on August 30, 2024 (Doc. 86).

## STATEMENT OF THE ISSUES

1. Whether a complaint plausibly states False Claims Act violations with the specificity required by Federal Rule of Civil Procedure 9(b) when, based on the Plaintiff-Relator's personal knowledge and experience as an attending physician, it details Defendants' scheme to defraud Medicare, identifies two publicly available year-end Medicare claims that falsely certified compliance with Medicare regulations, and describes the services provided to and Medicare claims submitted for three patients who Plaintiff-Relator personally cared for and who were fraudulently certified and admitted for inpatient psychiatric care.

2. Whether the district court erroneously concluded that the company listed as a counterparty to Plaintiff-Relator's employment agreement and the individual who owns that company, signed the employment agreement, and directly supervised Plaintiff-Relator nonetheless had no direct employment relationship with the Plaintiff-Relator and thus were legally incapable of retaliating against the Plaintiff-Relator in employment.

## INTRODUCTION

In a detailed complaint, Dr. Ramnarine Boodoo identified a scheme to defraud Medicare that he personally witnessed during his employment as a psychiatrist at the Riverview Regional Medical Center inpatient psychiatric facility (the "Riverview IPF"). The scheme centered around Dr. Boodoo's employer, River Region Psychiatry Associates, LLC (which does business in Alabama as Alabama Psychiatry LLC), its owner (Dr. Shankar Yalamanchili), and their unlawful agreement with Riverview Regional Medical Center to take advantage of Medicare's unique per diem payment system for inpatient psychiatric services to fraudulently maximize the Riverview IPF's profits.

This scheme was directly explained to, and forced on, Dr. Boodoo on several occasions. Dr. Yalamanchili, the CEO of Riverview Regional Medical Center (John Langlois), and the manager of the Riverview IPF (first Vivian Lee, then Patricia Ballard) each instructed Dr. Boodoo to only admit Medicare-insured patients to the Riverview IPF and to keep those patients admitted to the locked inpatient psychiatric facility for as long as possible, regardless of medical need. To effect their scheme, the defendants violated numerous material Medicare conditions of payment, including the requirement to have written admission criteria that are applied uniformly to both Medicare and non-Medicare patients—a rule specifically aimed at preventing the kind of fraud that occurred here. Dr. Yalamanchili and River Region

(d/b/a Alabama Psychiatry) also overbilled Medicare for the psychiatric services provided, fraudulently padding their bottom line even further.

Dr. Boodoo took his concerns about this fraudulent scheme to local law enforcement. But when River Region (d/b/a Alabama Psychiatry) and Dr. Yalamanchili learned that Dr. Boodoo had reported their misconduct, they fired him—at least, as soon as River Region (d/b/a Alabama Psychiatry) and Dr. Yalamanchili found someone to fill Dr. Boodoo's shoes who was willing to go along with their fraud.

Dr. Boodoo filed suit under the False Claims Act, alleging that Riverview Regional Medical Center (through its owner, Prime Healthcare Services-Gadsden, LLC), River Region d/b/a Alabama Psychiatry, and Dr. Yalamanchili submitted false Medicare claims, used materially false statements to support their Medicare claims, wrongly retained fraudulent Medicare payments, conspired together to defraud Medicare, and retaliated against Dr. Boodoo by firing him. But the district court dismissed each of Dr. Boodoo's fraud claims based on such a stringent application of Rule 9(b)'s fraud-pleading requirement that *no* relator in Dr. Boodoo's situation could have met it. Indeed, the district court's application of Rule 9(b) essentially requires a relator to have access to the defendant's billing systems to bring a claim under the False Claims Act. Given the division of labor between billing practices and clinical care in the modern hospital environment, the district court's application

of Rule 9(b) would prevent medical doctors—who are personally responsible for appropriately billing Medicare—from bringing a False Claims Act case. Such a ruling is incompatible with this Court's precedent, the False Claims Act, and the well-pled facts.

As for Dr. Boodoo's retaliation claim, the district court concluded that Dr. Boodoo had an employment relationship only with Alabama Psychiatry, not River Region or Dr. Yalamanchili, and therefore found that River Region and Dr. Yalamanchili were legally incapable of retaliating against Dr. Boodoo. This is both factually and legally wrong. Dr. Boodoo *did* have an employment relationship with River Region and Dr. Yalamanchili (and at the very least plausibly alleged such a relationship). And regardless, both River Region and Dr. Yalamanchili can be held liable for Alabama Psychiatry's retaliation under the False Claims Act.

This Court, upon conducting its own *de novo* review, should reverse the district court's decision and remand for these claims to proceed to discovery.

## STATEMENT OF THE CASE

### I. The False Claims Act

The False Claims Act is "the Government's primary litigative tool for combating fraud" against the United States. *Gose v. Native Am. Servs. Corp.*, 109 F.4th 1297, 1314 (11th Cir. 2024). Due to "a lack of resources on the part of Federal enforcement agencies," the False Claims Act "allow[s] and encourage[s] assistance

from the private citizenry who can make a significant impact on bolstering the Government's fraud enforcement effort." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1313 (11th Cir. 2021) (alteration adopted) (citations omitted).

Under the False Claims Act's "unique public-private" enforcement scheme, private parties (known as "relators") are empowered to sue in the name of the Government through "so-called *qui tam* actions." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023). Although the False Claims Act "is not an all-purpose antifraud statute," Congress intentionally wrote the False Claims Act "expansively" so that it would "reach all types of fraud, without qualification, that might result in financial loss to the Government." *Gose*, 109 F.4th at 1314 (internal quotation marks and citations omitted). Courts must apply the False Claims Act with the statute's broad remedial purpose in mind.

## II. Factual Background

Dr. Shankar B. Yalamanchili, a licensed psychiatrist, is the owner and founder of River Region Psychiatry Associates, LLC. Doc. 40 at 4 (¶ 10). River Region provides inpatient and outpatient psychiatric services across four states: Alabama, Tennessee, Georgia, and Kentucky. Doc. 40 at 4 (¶ 11). In Alabama, River Region operates as Alabama Psychiatry, LLC. Doc. 40 at 4 (¶ 12).

As part of its business, River Region contracts with local hospitals to manage the hospital's inpatient psychiatric facility. Doc. 40 at 4 (¶ 11).[1] One of these hospitals is Riverview Regional Medical Center in Gadsden, Alabama. *Id.* (¶ 12).[2] Riverview is a for-profit hospital owned by Prime Healthcare. Doc. 40 at 6 (¶ 14).

The Riverview IPF, which is operated by River Region d/b/a Alabama Psychiatry, has eighteen beds and is supposed to accept both Medicare and non-Medicare patients. Doc. 40 at 6 (¶ 14). Medicare patients are particularly profitable because Medicare Part A pays a per diem rate for each day the patient is admitted regardless of actual services rendered. Doc. 40 at 12–14 (¶¶ 40, 44–45). Medicare Part B then pays an additional, predetermined amount for designated services rendered to the patient. Doc. 40 at 12 (¶¶ 41–42). Medicare Part A claims are submitted by and paid to Riverview, while Medicare Part B claims are submitted by and paid to River Region d/b/a Alabama Psychiatry. Doc. 40 at 43, 59 (¶¶ 142, 193–94).

In 2018, River Region d/b/a Alabama Psychiatry hired Dr. Boodoo, a licensed psychiatrist, to provide inpatient psychiatric services at the Riverview IPF. Doc. 40 at 42 (¶ 140). Shortly after his employment began, however, Dr. Boodoo found that

---

1 *See also* River Region Psychiatry Associates: About Us, https://rrpa.us/ (last visited Mar. 28, 2025) ("RRPA manages inpatient psychiatry units and provides consult services to hospitals . . .").

2 *See also* Alabama Psychiatry: Affiliated Hospitals, https://alpsychiatry.com/affiliated-hospitals/ (last visited Mar. 28, 2024) (listing "Riverview Regional Medical Center").

the facility was engaging in practices that were inconsistent with Medicare's rules and regulations and were, in fact, fraudulent.

For example, Medicare requires that inpatient psychiatric facilities use written admission criteria that are "applied uniformly to both Medicare and non-Medicare patients." Doc. 40 at 14 (¶ 47); 42 C.F.R. § 412.25. But Riverview IPF intentionally did not use written admission criteria so that it could selectively admit profitable, and often inappropriate, Medicare patients while refusing to admit appropriate but unprofitable non-Medicare patients. Doc. 40 at 51–52 (¶¶ 175–80). Riverview's Chief Executive Officer and the director of the Riverview IPF both instructed Dr. Boodoo that Medicare patients should be admitted regardless of medical necessity and that non-Medicare patients should not be admitted even if they need inpatient psychiatric treatment. Doc. 40 at 45–46 (¶¶ 149–50).

Medicare also requires that patients be admitted to an inpatient psychiatric facility only while they need "active treatment . . . of an intensity that can be provided appropriately only in an inpatient hospital setting." Doc. 40 at 15 (¶ 49); 42 C.F.R. § 412.27(a). But Dr. Boodoo was repeatedly ordered to keep patients admitted to the Riverview IPF for as long as possible regardless of their treatment needs. The most egregious example occurred in January 2019, when Riverview's CEO John Langlois told Dr. Boodoo to increase the average length of stay for his patients—which was then around five days—to fifteen days and threatened that if Dr. Boodoo failed to do

so, he would be disciplined. Doc. 40 at 47–48 (¶¶ 158–60). When Dr. Boodoo refused to bend to Langlois' demand, Dr. Yalamanchili stripped Dr. Boodoo of his ability to discharge patients and required Dr. Boodoo to obtain his approval for any discharge. Dr. Yalamanchili would almost inevitably deny Dr. Boodoo's discharge request for at least another few days. Doc. 40 at 48–49 (¶¶ 163–66).

Dr. Boodoo also found that River Region employees at the Riverview IPF were improperly encouraged to bill Medicare Part B for services that were more expensive than those provided to the patient, a practice known as "up-coding." For example, River Region required its physicians to use a standard billing template that auto-populated the most expensive billing code. Doc. 40 at 44 (¶ 146).

Troublingly, the continued viability of River Region and Alabama Psychiatry's contractual relationship with the Riverview IPF depended on their willingness to continue to engage in these illegal practices. Indeed, Riverview's CEO threated that the contract with Riverview IPF would be "up for grabs" if Dr. Yalamanchili could not get his employees to participate in the fraudulent scheme, in response to which Dr. Yalamanchili increased his pressure on employees to comply with these directives. Doc. 40 at 50–51 (¶¶ 172–73).

Ultimately, Dr. Boodoo raised his concerns about Riverview's practices to local law enforcement. During a September 25, 2019 conversation, and in a follow-up email the next day, Dr. Boodoo described to Etowah County Probate Judge Scott

Hassell the ongoing scheme at the Riverview IPF. Doc. 40 at 49 (¶ 167). Judge Hassell referred Dr. Boodoo's allegations to investigators from the Etowah County District Attorney's Office and directly notified the hospital's administration that he had received allegations of fraudulent admissions and billing practices in the Riverview IPF. Doc. 40 at 49–50 (¶¶ 167–68).

After learning that Dr. Boodoo has reported their misconduct to law enforcement, Dr. Yalamanchili and River Region d/b/a Alabama Psychiatry engaged in a monthslong campaign against Dr. Boodoo that included threatening letters and a pretextual performance-improvement plan. *See* Doc. 40 at 50 (¶ 168). When these actions did not have the desired effect of bullying Dr. Boodoo into submission, Dr. Yalamanchili and River Region d/b/a Alabama Psychiatry found a replacement who, unlike Dr. Boodoo, was willing to "do nothing but sign" fraudulent documentation. Doc. 40 at 51, 63 (¶¶ 174, 209–11). River Region d/b/a Alabama Psychiatry—through Dr. Yalamanchili—then terminated Dr. Boodoo's employment on December 16, 2019. Doc. 40 at 51, 63 (¶¶ 174, 209).

## III. Procedural History

Dr. Boodoo filed suit, asserting eight claims against River Region, Alabama Psychiatry, Dr. Yalamanchili, and Prime Healthcare (collectively, the "Riverview Defendants"): submitting false claims (Counts Two through Five), using false statements or records (Count Seven), reverse false claims (Count Nine), conspiracy

(Count Eleven), and unlawful retaliation (Count Thirteen).[3] The amended complaint detailed how the Riverview Defendants were defrauding Medicare and how River Region, Alabama Psychiatry, and Dr. Yalamanchili had retaliated against Dr. Boodoo for trying to stop their illegal practices. The complaint also described specific instances of fraudulent claims that were submitted to Medicare under this scheme.

First, Dr. Boodoo identified Riverview's 2018 and 2019 annual "cost reports," which were submitted to Medicare using CMS Form 2552-10. Doc. 40 at 20 (¶ 69). In these cost reports—which are considered "claims" for purposes of False Claims Act liability because in them the hospital claims the total amount of Medicare Part A reimbursements to which it is entitled—Riverview certified "that the services identified in this cost report were provided in compliance with [Medicare's governing] laws and regulation." Doc. 40 at 21 (¶ 72). These certifications were false because, among other reasons, Riverview IPF purposely did not use written admission criteria applied uniformly to Medicare and non-Medicare patients. Yet, as discussed below, the district court never analyzed whether Dr. Boodoo description of these false claims satisfied Rule 9(b)'s pleading standard.

---

[3] Dr. Boodoo was joined in his lawsuit by Dr. Andrew Wilkerson. Dr. Wilkerson, who is also a licensed psychiatrist, was contracted to provide inpatient psychiatric services at Shoals Hospital in Muscle Shoals, Alabama. Dr. Wilkerson is not a party to this appeal, and therefore his claims concerning Shoals Hospital are not discussed herein.

Instead, the district court's Rule 9(b) analysis focused exclusively on Dr. Boodoo's allegations of false Medicare claims submitted for three specific patients whom Dr. Boodoo had personally treated: "Patient D," who spent twelve days in the Riverview IPF despite exhibiting no acute psychiatric symptoms or disruptive behavior during that time; "Patient E," whose early-stage dementia was easily manageable through outpatient care but who was nonetheless admitted to the Riverview IPF for ten days, during which time she received no acute psychiatric treatment; and "Patient F," who spent three days in the Riverview IPF for "racing thoughts" despite receiving no treatment. Doc. 40 at 53–58 (¶¶ 182–84, 187–88, 190–91). The complaint detailed the amount billed to Medicare for each day that each of these patients was admitted, the exact form on which these patients' claims were submitted to Medicare (ASC X12 837I), and the total amount of each false claim submitted ($8,595.79; $7,164; and $2,327.38 for Patients D, E, and F, respectively). Doc. 40 at 54–58 (¶¶ 185–86, 188–89, 191–92).

The district court recognized that Dr. Boodoo had sufficiently alleged that the Riverview Defendants engaged in improper practices but concluded that Dr. Boodoo had not satisfied his "obligation under Rule 9(b) [of the Federal Rules of Civil Procedure] to plead specific facts plausibly showing the actual submission of a false claim." Doc. 69 at 20–21. In the district court's view, because Dr. Boodoo did not have "access to or knowledge of Prime's billing department or procedures," he had

failed to specifically allege the "who, what, where, when, and how of any fraudulent submissions to the government." Doc. 69 at 20–23. On this basis, the district court granted the Riverview Defendants' motions to dismiss Dr. Boodoo's fraud claims.

As for the retaliation claim, which was asserted against Dr. Yalamanchili, River Region, and Alabama Psychiatry, the district court concluded that "[b]ecause there is no allegation that Dr. Yalamanchili or River Region employed Dr. Boodoo, the amended complaint does not plausibly allege that either Dr. Yalamanchili or River Region could have retaliated against him," and therefore dismissed the retaliation claim against them. Doc. 69 at 38.

Following the motion-to-dismiss proceedings, the district court severed Dr. Boodoo's retaliation claim against Alabama Psychiatry into a new docket number under Rule 21 of the Federal Rules of Civil Procedure. Doc. 76. The judgment on Dr. Boodoo's severed retaliation claim is the subject of a separate appeal before this Court: No. 24-12266. Dr. Boodoo moved to consolidate the two appeals, but that motion was denied.

Once Dr. Boodoo's sole remaining claim was severed into a different case, the only live claim in Case No. 2:21-cv-00569 was that of Dr. Boodoo's co-plaintiff Dr. Wilkerson. On August 25, 2023, Dr. Wilkerson filed a stipulation dismissing his entire action with prejudice. Doc. 84. At first, the district court "[b]eliev[ed] the stipulation to be self-executing under Federal Rule of Civil Procedure

41(a)(1)(A)(ii)" and therefore closed the case by minute entry on August 25, 2023. Doc. 85 at 2. But the district court later realized that the stipulation was *not* self-executing because it had not been signed by all parties to the case. Doc. 85 at 3.[4] So, in August 2024, the district court vacated the minute entry closing the case, construed the stipulation as a motion under Rule 41(a)(2), granted the motion, and dismissed Dr. Wilkerson's claims. Doc. 85 at 3–4. Dr. Boodoo's appeal from that final judgment "confers jurisdiction [for this Court] to review the earlier Fed. R. Civ. P. 12(b)(6) dismissal" as well. FED. R. APP. P. 60(b) advisory committee's note to 2021 amendment.

## IV. Standard of Review

The district court's motion-to-dismiss ruling is reviewed *de novo*. *Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1207 (11th Cir. 2018). This Court "must accept all facts in the complaint as true and view those facts in the light most favorable to the plaintiff." *Id.*

Under Rule 8 of the Federal Rules of Civil Procedure, a plaintiff's complaint must set forth "a short and plain statement of the claim" through "simple, concise, and direct" factual allegations. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051 (11th Cir. 2015) (citing FED. R. CIV. P. 8). To survive a Rule 12(b)(6) motion to

---

4 Under Rule 41(a)(1)(A)(ii), a stipulation of dismissal is self-executing only if it is "signed by all parties who have appeared."

dismiss, the allegations in the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"In an action under the False Claims Act, Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b)." *Urquilla-Diaz*, 780 F.3d at 1051. "To satisfy this heightened-pleading standard in a False Claims Act action, the relator has to allege 'facts as to time, place, and substance of the defendant's alleged fraud,' particularly, 'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Id.* (quoting *United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002)). When applying Rule 9(b) in a False Claims Act case, courts must apply a "nuanced, case-by-case approach," *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 704 (11th Cir. 2014), to carefully reconcile Rule 9(b)'s "stringent requirements" with "the general philosophy of simplified pleading expressed by Federal Rule of Civil Procedure 8 so that the former does not destroy the latter," 5 Charles A. Wright et al., *Federal Practice & Procedure* § 1241 (4th ed.).

## SUMMARY OF THE ARGUMENT

1. Dr. Boodoo's amended complaint plausibly and specifically alleged four violations of § 3729(a)(1) of the False Claims Act: (1) submitting false claims; (2) making or using false statements; (3) fraudulently avoiding an obligation to repay money owed to the government; and (4) conspiracy. The district court erred in concluding otherwise, so this Court, upon *de novo* review, should reverse.

First, Dr. Boodoo pointed to annual year-end cost reports submitted to Medicare which certified that all claimed services had been rendered in compliance with Medicare's governing rules and regulations, including operating with admission criteria "applied uniformly to both Medicare and non-Medicare patients." These year-end cost reports are "claims" for purposes of False Claims Act liability. And these claims are legally false because the Riverview IPF was not, in fact, complying with Medicare's requirements. The certification within those cost reports constituted a false *statement* for purposes of False Claims Act liability. And the purpose of these mandatory year-end claims is to identify *over*payments that have been made during the year. Indeed, Medicare regulations require that any such overpayment be refunded to the government along with submission of the cost reports—a requirement that the defendants here intentionally flouted.

Second, Dr. Boodoo identified three specific exemplar patients for whom the Riverview Defendants submitted or caused to be submitted false claims for payment

to Medicare. These claims were false because the patients were not eligible for inpatient psychiatric care under Medicare's rules. The Riverview Defendants knew this but submitted false claims for each patient to Medicare anyway. Those false claims had been facilitated by false statements in the patients' admission paperwork that they had a qualifying psychiatric diagnosis and needed psychiatric care of such intensity that it could be provided only in an inpatient setting. The defendants knowingly retained their ill-gotten gains from these three patients as well.

Finally, Dr. Boodoo explained that this conspiracy to defraud the government was centered on the contractual arrangement between Prime Healthcare, River Region, Alabama Psychiatry, and Dr. Yalamanchili. Prime paid these parties to manage the inpatient psychiatric facility at Prime's for-profit Riverview Regional Medical Center, and in return these parties agreed to admit any Medicare-insured patients and to keep them admitted for as long as possible to inflate Prime's profits.

2. Dr. Boodoo's amended complaint also plausibly and specifically alleged retaliation against River Region, Alabama Psychiatry, and Dr. Yalamanchili. The district court did not dispute that conclusion. Rather, the court concluded that River Region and Dr. Yalamanchili were not Dr. Boodoo's employer and were therefore legally incapable of retaliating against him for purposes of False Claims Act liability. But Dr. Yalamanchili, as sole owner of both River Region and Alabama Psychiatry, signed Dr. Boodoo's employment agreement. And the parties to the employment

agreement were Dr. Boodoo, on the one hand, and "River Region Psychiatry Associates, LLC dba Alabama Psychiatry LLC" on the other. So the district court was simply wrong as a matter of fact. Moreover, even if there were not a contractual employment relationship, there were various theories through which both River Region and Dr. Yalamanchili could have, and should have, been treated as an employer for purposes of Dr. Boodoo's retaliation claim. But the district court considered none of them. So, this Court, after *de novo* review, should reverse dismissal of this claim as well.

## ARGUMENT

### I. Dr. Boodoo plausibly and specifically pled false claims in the form of annual cost-reports and bills for three patients' services, but the district court erroneously held that the cost reports were not "claims" for purposes of the False Claims Act.

The False Claims Act "recognizes two types of false claims: factually false claims and legally false claims." *United States ex rel. Quartararo v. Cath. Health Sys. of Long Island Inc.*, 84 F.4th 126, 130 (2d Cir. 2023); *see also Yates*, 21 F.4th at 1299 ("Case law . . . has identified various types of false claims and statements."). A "'claim' . . . means any request or demand . . . for money or property." 31 U.S.C. § 3729(b)(2)(A). The term is interpreted "broadly" to include any "call upon the government fisc." *Hubbard v. United States*, 514 U.S. 695, 703 n.5 (1995); *Clausen*, 290 F.3d at 1311 (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)). A claim is legally false "when a person or entity fails to

comply with statutory, regulatory, or contractual requirements but certifies that it has complied with them." *Yates*, 21 F.4th at 1299. And a claim is factually false "when it misrepresents the goods or services provided." *Id.*

The amended complaint plausibly and specifically pled both types of false claims. Riverview Regional Medical Center's 2018 and 2019 annual Form 2552 cost reports were legally false claims. And the Medicare submissions for Patients D, E, and F were factually and legally false claims. But the district court erroneously determined that the cost-reports were not claims for purposes of False Claims Act liability and therefore addressed only the individual-patient claims.

### ***A. Riverview Regional Medical Center's 2018 and 2019 Form 2552 cost reports were legally false claims.***

Riverview Regional Medical Center's Form 2552 cost reports were legally false because they certified compliance with Medicare standards that, in fact, were ignored. But the district court disregarded Dr. Boodoo's allegations about these legally false claims by wrongly concluding that these annual cost reports were not "claims" for purposes of False Claims Act liability. This Court, after *de novo* review, should reverse.

In its annual "cost report" (filed using CMS Form 2552), Riverview IPF claims the total amount of Medicare Part A reimbursements to which it is entitled for the year. These cost reports are mandatory for all hospitals (like Riverview) that bill Medicare. Doc. 40 at 20 (¶ 69). "Medicare relies on the hospital cost report to

determine whether the provider is entitled to more reimbursement than it has received through interim payments or whether the provider has been overpaid and must refund Medicare a portion of the interim payments." *Id.* (citing 42 C.F.R. §§ 405.1803, 413.60).

As a result of these mandatory cost reports, Medicare paid Riverview $2,976,306 for inpatient psychiatric services in 2018 and $1,775,690 for inpatient psychiatric services in 2019. Doc. 40 at 59 (¶¶ 193–94). For this reason, these cost reports are "call[s] upon the government fisc" and therefore "claims" for purposes of False Claims Act liability. *See Clausen*, 290 F.3d at 1311. Indeed, the district court's ruling that cost reports are not "claims" under the False Claims Act "has been squarely rejected." *United States v. Bourseau*, 531 F.3d 1159, 1164 n.1 (9th Cir. 2008) (citing *United States v. Neifert-White,* 390 U.S. 228, 233 (1968)); *see also United States ex rel. Matheny v. Medco Health Sols., Inc*., 671 F.3d 1217, 1225 (11th Cir. 2012) (finding a false certification of compliance that concealed government overpayments qualifies as a "false claim.")

The 2018 and 2019 cost-report claims were legally false. Each cost report contained a certification—signed by Riverview's administrator or Chief Financial Officer—"that the services identified in this cost report were provided in compliance with [Medicare's governing] laws and regulation." Doc. 40 at 21 (¶ 72). But the services Riverview IFP provided were *not* in compliance with Medicare's rules. To

the contrary, Riverview IPF did not have any written admission criteria and instead based its admittance decisions solely on the patient's insurance coverage— violating Medicare's requirement that IPFs use "written admission criteria that are applied uniformly to both Medicare and non-Medicare patients." Doc. 40 at 45–46 (¶ 150); 42 C.F.R. 412.25. Moreover, the Riverview IPF kept patients admitted for as long as possible regardless of their medical needs, *see* Doc. 40 at 47–48 (¶¶ 158–60)—violating Medicare's requirements that IPFs keep patients admitted only while in need of "intensive, 24-hour, specialized psychiatric intervention that cannot be provided outside the psychiatric hospital." Doc. 40 at 16–17 (¶ 55) (quoting CMS State Operations Manual); *see also* Doc. 40 at 15 (¶ 49) (quoting 42 C.F.R. § 412.27(a)'s requirement that IPFs only admit patients in need of "active treatment . . . of an intensity that can be provided appropriately only in an inpatient hospital setting"). Riverview IPF also improperly up-coded its patient services. Doc. 40 at 44 (¶ 146). And Riverview IPF engaged in a kickback-tainted referral system in violation of the federal Anti-Kickback statute, 42 U.S.C. § 1320a-7b, because its contractual relationship with River Region and Alabama Psychiatry depended on those entities accepting Medicare patients referred from Riverview Regional Medical Center to the Riverview IPF even when patients did not meet admission criteria. Doc. 40 at 3, 50–51 (¶¶ 5, 172).

The district court considered none of this information. Instead, the court wrongly concluded that the annual cost reports were not claims themselves but needed to be "link[ed] . . . to the presentment of an actually false claim." Doc. 69 at 20. This was legal error. As Dr. Boodoo alleged, and precedent demonstrates, Form 2552 cost reports are "claims." Doc. 40 at 66–67, 74 (¶¶ 219, 225, 253); *Bourseau*, 531 F.3d at 1164 n.1 (explaining that the argument that "cost reports are not 'claims' for payment" under the False Claims Act "has been squarely rejected" and collecting authorities). So the district court should have analyzed whether Dr. Boodoo sufficiently pled False Claims Act causes of action based on these cost reports separately from its analysis of the individual-patient claims. But it did not. As explained in Part II below, this Court, after conducting the proper analysis *de novo*, should conclude that Dr. Boodoo's allegations about the annual cost reports satisfy Rule 9(b)'s requirements and should therefore reverse the district court's dismissal.

### *B. The Medicare submissions for Patient D, Patient E, and Patient F were also false claims.*

Hospitals use an institutional claim format known as the ASC X12 837 to electronically submit claims under Medicare Part A. Doc. 40 at 20 (¶ 68). And healthcare providers use this same form to submit claims for professional fees covered by Medicare Part B. Doc. 40 at 21 (¶ 74). Dr. Boodoo specifically and plausibly alleged that three ASC X12 837 claims made by the Riverview Defendants were false.

The first false ASC X12 837 claim concerned "Patient D," an 81-year-old who was insured by Medicare. Doc. 40 at 53 (¶ 182). Patient D had been admitted to Riverview Regional Medical Center's general inpatient unit for a low potassium level. Doc. 40 at 54 (¶ 184). Although he exhibited "no behavioral or combative problems" during his five-day stay in the hospital's general inpatient unit, he was admitted to the Riverview IPF based on the falsified diagnosis of "combative behavior." Doc. 40 at 53–54 (¶ 183). Dr. Yalamanchili personally admitted Patient D from the general inpatient unit to the Riverview IPF "at 11:00 PM on October 4, 2019—while Dr. Boodoo was not at the hospital." Doc. 40 at 53 (¶ 182). Dr. Yalamanchili's admission decision was based solely on the fact that Patient D was "no longer profitable under the [general] in-patient [] payment system," so he was "moved . . . to the Riverview IPF to capitalize on the IPF per diem payments." Doc. 40 at 54 (¶ 184). "Patient D spent twelve days in the Riverview IPF," during which time he "exhibited no acute psychiatric symptoms and no significant disruptive behavior." *Id*. Accordingly, Patient D's "admission and services rendered were not legally billable services under" Medicare, but the Riverview Defendants submitted an $8,595.79 claim for him nonetheless. Doc. 40 at 54–55 (¶¶ 184–86).

The second false ASC X12 837 claim concerned "Patient E," an 83-year-old Medicare patient who, like Patient D, had been initially admitted to Riverview Regional Medical Center's general inpatient unit after a fall. Doc. 40 at 55–56

(¶ 187). After three days of treatment "for an electrolyte imbalance," Patient E "surpass[ed] her profitability" under the general inpatient billing system. *Id*. But, since Patient E had early-stage dementia, Dr. Yalamanchili saw a profit opportunity and admitted her to the Riverview IPF at 6:42 PM on April 29, 2019 "solely because she was insured by Medicare." *Id*. Patient E could have easily managed her early-stage dementia at home. Doc. 40 at 56 (¶ 188). But instead, Patient E spent ten days in the Riverview IPF, during which time she "exhibited no acute psychiatric symptoms." *Id*. Because Patient E did not "qualif[y] for active psychiatric treatment," her "admission and the attendant services rendered were not legally billable services" under Medicare. *Id*. But the Riverview Defendants submitted a $7,164 claim for her anyway. Doc. 40 at 57 (¶ 189).

The third false ASC X12 837 claim concerned "Patient F," a 69-year-old Medicare-insured patient. Doc. 40 at 57 (¶ 190). Dr. Yalamanchili admitted Patient F to the Riverview IPF at 10:05 PM on March 12, 2019 because her daughter said "she appeared to be having racing thoughts for one day." Doc. 40 at 57–58 (¶¶ 190–91). When Dr. Boodoo examined Patient F three days later, he "immediately recognized that Patient F was inappropriate for inpatient psychiatric care"—with no "documented psychiatric diagnosis upon admission and had no known psychiatric history," "no suicidal, homicidal, or assaultive ideations or feelings," and no "auditory or visual hallucinations"—and discharged her. Doc. 40 at 57–58 (¶ 191).

But Patient F should have never been admitted to the Riverview IPF, meaning that the "attendant services rendered were not legally billable services under" Medicare. *Id*. The Riverview Defendants submitted a $2,327.38 claim for her regardless. Doc. 40 at 58 (¶ 192).

The district court took no issue with the proposition that ASC X12 837 submissions for these three patients would qualify as "claims" for purposes of False Claims Act liability. But the court concluded that Dr. Boodoo had not carried his burden of plausibly alleging actual *submission* of these claims with the specificity required by Rule 9(b). As explained below, this conclusion was wrong and should be reversed.

## II. Based on these legally and factually false claims, Dr. Boodoo plausibly and specifically pled submission of false claims, use of false statements, reverse false claims, and conspiracy in violation of the False Claims Act.

These legally and factually false claims formed the basis for seven substantive False Claims Act counts in the amended complaint, which spanned four causes of action: (1) "presentment" claims under 31 U.S.C. § 3729(a)(1)(A) against Prime Healthcare (Counts Two and Five) and River Region, Alabama Psychiatry, and Dr. Yalamanchili (Counts Three, Four, and Five); (2) a "make or use" claim under 31 U.S.C. § 3729(a)(1)(B) against Prime Healthcare, River Region, Alabama Psychiatry, and Dr. Yalamanchili (Count Seven); (3) a "reverse" false claim under 31 U.S.C. § 3729(a)(1)(G) against Prime Healthcare, River Region, Alabama

Psychiatry, and Dr. Yalamanchili (Count Nine); and (4) a "conspiracy" claim under 31 U.S.C. § 3729(a)(1)(C) against Prime Healthcare, River Region, Alabama Psychiatry, and Dr. Yalamanchili (Count Eleven). Each of the remaining elements for these causes of action was pled plausibly and with the requisite specificity to survive dismissal.

To be sure, the district court substantively analyzed Dr. Boodoo's False Claims Act causes of action only with respect to the individual-patient claims. It never considered the merits of Dr. Boodoo's causes of action based on the annual cost reports because it wrongly concluded that the cost reports were not "claims" at all. While this Court could reverse and remand for the district court to conduct that analysis in the first instance, *see, e.g.*, *Pouyeh v. Public Health Tr. of Jackson Health System*, 832 F. App'x 616, 625 (11th Cir. 2020), given the *de novo* standard of review and the interests of judicial efficiency, the Court could and should decide this issue itself in Dr. Boodoo's favor.

When doing so, the rule that "[a] plaintiff must satisfy Rule 9(b) with respect to the circumstances of the fraud he alleges—but not as to matters that have no relevance to the fraudulent acts"—merits particular consideration. *Mastej*, 591 F. App'x at 709. The type of fraud alleged with respect to the cost reports "does not depend . . . on the particularized medical or billing content of any given claim form." *See id.* at 708. Rather, Dr. Boodoo's alleged cost-report fraud depends solely on

whether the Riverview IPF submitted costs reports that falsely certified compliance with threshold conditions of Medicare payment, such as the requirement to apply written admission criteria uniformly to both Medicare and non-Medicare patients. And the amended complaint plausibly and specifically alleged that the Riverview IPF was knowingly violating Medicare requirements while simultaneously submitting cost reports that falsely certified compliance with them. Doc. 40 at 20–21, 51–52, 59 (¶¶ 69–73, 175–80, 193). Because the "claim-falsity" of the cost reports "does not turn on [the] usual types of medical-claim details," this Court, after applying "Rule 9(b) with respect to the [specific] circumstances of the fraud [Dr. Boodoo] alleges," should conclude that the amended complaint sufficiently pled False Claims Act violations based on these cost reports and the Riverview IPF's violations of Medicare-payment conditions. *See Mastej*, 591 F. App'x at 708–09.

### *A. Dr. Boodoo plausibly established the submission of false claims, in violation of § 3729(a)(1)(A), with specificity.*

To establish a cause of action under § 3729(a)(1)(A) for submitting a false claim, a relator must show that the false claim "was presented, or caused to be presented, for payment or approval . . . with the knowledge that the claim was false." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017). When a cause of action under § 3729(a)(1)(A) is based on a theory of legal falsity, the relator also must prove that the falsity was "material"—in other words,

that compliance with the Medicare rule or regulation that was falsely certified was "a prerequisite to obtaining a government benefit." *Urquilla-Diaz*, 780 F.3d at 1052.

The amended complaint included four counts of submission of a false claim in violation of § 3729(a)(1)(A). Count Two (against Prime Healthcare) and Count Three (against River Region, Alabama Psychiatry, and Dr. Yalamanchili) pertained to the Riverview IPF's failure to uniformly apply admission criteria and failure to discharge patients who did not need inpatient treatment. Count Four (against all four Riverview Defendants) concerned upcoding. And Count 5 (also against all four Riverview Defendants) related to kickbacks. Each was pled plausibly and with the requisite specificity to satisfy Rule 9(b).

*1. Materiality*

Each of the Medicare regulations with which Riverview falsely certified compliance was a prerequisite for the Riverview Defendants to receive payments from Medicare and was therefore "material." *Urquilla-Diaz*, 780 F.3d at 1052.

Beginning with uniform application of admissions criteria, "this critical requirement goes to the essence of the bargain between Medicare and a hospital seeking exclusion from the standard IPPS and to be paid under the per diem IPF PPS." Doc. 40 at 14 (¶ 47). Indeed, 42 C.F.R. § 412.25(a)(2) expressly states that "[i]n order to . . . be paid under the inpatient psychiatric facility prospective payment

system . . . a psychiatric or rehabilitation unit must . . . [h]ave written admission criteria that are applied uniformly to both Medicare and non-Medicare patients."

Similarly, "the provision of 'active treatment' is an essential requirement for inpatient psychiatric care, [and] goes to the essence of the bargain between Medicare and a hospital seeking exclusion from the standard IPPS and to be paid under the per diem IPF PPS." Doc. 40 at 17 (¶ 56). 42 C.F.R. § 412.27(a) provides that to "be paid under the prospective payment system . . . a psychiatric unit must . . . [a]dmit only patients whose admission to the unit is required for active treatment, of an intensity that can be provided appropriately only in an inpatient hospital setting."

As for upcoding, this Court has explained that accurately recording the quantity and quality of services rendered goes "to the heart of [a party's] ability to obtain reimbursement from Medicare," and thus upcoding is "plain[ly] and obvious[ly] material[]." *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1105 (11th Cir. 2020). So too the Anti-Kickback Statute, compliance with which "is a condition of payment by the Medicare program." *McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005).

*2. Presentment*

Because "[t]he submission of a claim is . . . the *sine qua non* of a [§ 3729(a)(1)(A)] violation," Rule 9(b) requires that a complaint include not only details of the alleged fraudulent scheme, but also "some indicia of reliability . . . to

support the allegation of *an actual false claim* for payment being made to the Government." *Clausen*, 290 F.3d at 1311. In determining whether a relator has "present[ed] the required indicia of reliability that a false claim was actually submitted," this Court employs a "nuanced, case-by-case approach." *Mastej*, 591 F. App'x at 704. Dr. Boodoo established sufficient "indicia of reliability" that the cost reports and individual-patient claims were submitted to Medicare to survive a motion to dismiss.

a. The annual cost reports were submitted to Medicare.

There is no question that Riverview's annual cost reports were submitted to the government. Comprehensive data concerning each cost report is publicly available on the Centers for Medicare & Medicaid Services' website.[5] That data would not be available if a cost report had never been submitted. Indeed, federal regulations require Riverview to file an annual cost report and mandate that the report be signed by either Riverview's administrator or Riverview's Chief Financial Officer. 42 C.F.R. §§ 413.20, 413.24. Based on this publicly available data, the amended complaint specifically alleged the details of each submitted cost report: "in

---

5 Centers for Medicare & Medicaid Services, *Cost reports: Hospital 2552-2010 form*, https://www.cms.gov/data-research/statistics-trends-and-reports/cost-reports/hospital-2552-2010-form (last visited Mar. 28, 2025). This Court can take judicial notice of this data. *See R.S.B. Ventures, Inc. v. F.D.I.C.*, 514 F. App'x 853, 857 n.2 (11th Cir. 2013) (taking judicial notice of information found on government website); *United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 439 (E.D. Pa. 2020) (taking judicial notice of public records published by CMS in False Claims Act case).

early 2019, Riverview Regional Medical Center submitted a year-end CMS Cost Report Form 2552-10 for all IPF PPS claims in 2018," which "claimed a net Federal IPF PPS payment of $2,514,118 and an additional $801,588 in Net IPF PPS Outlier payments for a total of $3,315,706," and "in early 2020, Defendant Riverview Regional Medical Center submitted a year-end CMS Cost Report Form 2552-10 for all IPF PPS claims in 2019," which "claimed a net Federal IPF PPS payment of $1,979,657 and an additional $121,089 in Net IPF PPS Outlier payments." Doc. 40 at 59 (¶¶ 193–94). And because Dr. Boodoo "pled specifics relating to the submission of a specific statement in a specific document, submitted by a specific person . . . as required by a particular government [regulation]," he "d[id] not need to further support [his] well-pled factual allegations with some other 'factual basis,' such as personal knowledge of the submission or employment in the compliance department." *Matheny*, 671 F.3d at 1225.

b. <u>The individual-patient claims were submitted to Medicare.</u>

As for the individual exemplar false claims for Patients D, E, and F, Dr. Boodoo concedes that the amended complaint does not *conclusively* establish that such claims were actually submitted to the government. But it was not required to do so. Instead, the complaint needed only to provide "*some* indicia of reliability . . . to support the allegation of an actual false claim for payment being made to the Government." *Mastej*, 591 F. App'x at 707 (quoting *Clausen*, 290 F.3d at 1311)

(emphases altered). The information that Dr. Boodoo *did* provide was sufficiently specific and plausibly established indicia of reliability of presentment of these claims to survive a motion to dismiss.

The district court reached the contrary conclusion—that there was "no indicia of reliability for Dr. Boodoo's presentment allegations"—based solely on the fact that Dr. Boodoo did not have "access to or knowledge of [the Defendants'] billing department or procedures." Doc. 69 at 22–23. But this overly rigid application of Rule 9(b) is contrary to this Court's instructions to employ a "nuanced, case-by-case approach," *Mastej*, 591 F. App'x at 704, and to be "more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct." *Matheny*, 671 F.3d at 1230. And it wrongly overrode the general philosophy of simplified pleading expressed by Rule 8. *See Urquilla-Diaz*, 780 F.3d at 1051 ("Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b).").

The limitations on the specifics that Dr. Boodoo provided in the amended complaint are a direct reflection of the fact that Dr. Boodoo was not, and has never claimed to be, an employee in the billing department. He was the attending physician in a hospital that operated without written admission criteria, and he was specifically instructed by hospital executives and Dr. Yalamanchili to knowingly admit ineligible

patients to inpatient psychiatric care. It is in precisely this situation—when the relator is an "outsider" with respect to billing operations but "alleges personal knowledge or participation in the fraudulent conduct"—that courts should be "more tolerant toward complaints that leave out some particularities of the submissions of a false claim." *Matheny*, 671 F.3d at 1230; *see also Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003) (explaining that when a complaint includes highly detailed allegations about fraudulent conduct but *less* detailed allegations about presentment of false claims, "Rule 9(b)'s heightened pleading standard may be applied less stringently," especially when factual information about the billing practices "is peculiarly within the defendant's knowledge or control").

Otherwise, hospitals or healthcare providers could easily thwart the policy goals of the False Claims Act by intentionally siloing medical professionals from billing operations, thereby granting itself de facto immunity from suit. In the scenario created by the district court's ruling, essentially no relator working in clinical care could pass Rule 9(b) scrutiny because, as was true at Riverview, hospital billing personnel (who know about claims' submission) are often isolated from patient-care personnel (who know those claims are fraudulent). With these consequences—and the overarching principle that courts must apply Rule 9(b) "on a case-by-case basis"—in mind, this Court should find that Dr. Boodoo has pled

sufficient specifics concerning the presentment of false claims for Patients D, E, and F. *Mastej*, 591 F. App'x at 704 (quoting *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006)).

Beginning with "who" and "where," the amended complaint alleged that Prime Healthcare's billing department submitted false Medicare Part A claims for Patients D, E, and F from their offices in Gadsden, Alabama under instructions from CEO John Langlois and other Riverview administrators, and that River Region and Alabama Psychiatry's billing department submitted false Medicare Part B claims from their headquarters in Montgomery, Alabama under instructions from Dr. Yalamanchili. Doc. 40 at 54–58, 65, 67–69, 71, 74, 76 (¶¶ 185–86, 188–89, 191–92, 218, 224, 226, 231, 233, 243, 244, 253, 260).

The Supreme Court long ago clarified that the False Claims Act "extend[s] to corporations" and other legal entities. *Cook Cnty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 125 (2003). Accordingly, Rule 9(b) is satisfied when the complaint identifies the specific "person *or entity* who submitted a claim." *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1323 (11th Cir. 2009) (emphasis added). There is simply no requirement that a complaint "specify by name or title the person who actually pushed the send button and transmitted the" claim. *Matheny*, 671 F.3d

at 1230.[6] The amended complaint thus pled the "who" and "where" of the presentment of a false claim with the required specificity.

Turning to "what" and "how," *Clausen* lists types of information—"amounts of charges," "actual dates," "policies about billing," "second-hand information about billing practices," and "cop[ies] of a [medical] bill or payment"—that can be included in a complaint to establish submission of a specific fraudulent claim. 290 F.3d at 1312. But this Court was careful to note in *Clausen* that a complaint need not provide "all of this information"; rather, just "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." *Id.* at 1312 n.21. The amended complaint satisfies this standard because it sets forth the "amount of charges" billed to Medicare for each day Patients D, E, and F were admitted to the Riverview IPF, the "actual dates" relating to each charge, the exact form on which the claim was submitted (ASC X12 837I), and the total amount of the false claim submitted. Doc. 40 at 54–58 (¶¶ 185–86, 188–89, 191–92).

Finally, "when." For each of Patients D, E, and F, the amended complaint set forth the specific date and time when the patient was admitted to the Riverview IPF, the date the patient was discharged, and the dates on which amounts were billed. True, the amended complaint does not include allegations as to the specific dates on

---

6 Dr. Boodoo *did* identify the specific person who transmitted false claims for River Region, Alabama Psychiatry, and Dr. Yalamanchili: "Alabama Psychiatry billing employee Erin Gottschalk." Doc. 40 at 69 (¶ 233).

which the patients' medical bills were submitted to the government or paid by Medicare. Dr. Boodoo simply had no access to that information: Medicare Part A claims were billed by Riverview, not by Dr. Boodoo's employers River Region d/b/a Alabama Psychiatry; and the Medicare Part B billing that *was* handled by River Region d/b/a Alabama Psychiatry was conducted by a separate billing department in their corporate office in Montgomery. That fact should not be held against Dr. Boodoo, especially considering the extensive and specific allegations on the fraudulent conduct at issue and the "who, what, where, and how" of the submission of factually false claims. *See Hill*, 2003 WL 22019936, at *3 (holding that "Rule 9(b)'s heightened pleading standard may be applied less stringently," especially when information about the billing practices and procedures "is peculiarly within the defendant's knowledge or control").

*3. Causation*

Section 3729(a)(1)(A) prohibits both "presenting" and "causing to be presented" a false claim. *Ruckh*, 963 F.3d at 1106. "This creates two theories of liability: (1) a presentment theory and (2) a cause to be presented theory." *Id.*

Prime Healthcare falls squarely under the "presentment theory." As the owner of the Riverview Regional Medical Center, Prime Healthcare presented the hospital's 2018 and 2019 cost reports to Medicare and also submitted the bills for Patients D, E, and F to Medicare for payment.

As for River Region, Alabama Psychiatry, and Dr. Yalamanchili, they presented the Medicare Part B bills for Patients D, E, and F. And they caused Prime Healthcare to submit the legally and factually false Medicare Part A claims.

This Court uses "proximate causation" as the "standard by which to determine whether there is a sufficient nexus between the defendant's conduct and the submission of a false claim." *Ruckh*, 963 F.3d at 1107. So, River Region, Alabama Psychiatry, and Dr. Yalamanchili "caused the submission of a claim for Medicare reimbursement if the[ir] conduct was (1) a substantial factor in inducing providers to submit claims for reimbursement, and (2) if the submission of claims for reimbursement was reasonably foreseeable or anticipated as a natural consequence of [their] conduct." *Id.* It was.

*Ruckh* itself is instructive. There, a registered nurse brought a False Claims Act action against two nursing home facilities and La Vie Management, which provided management services at those facilities. *Id.* at 1094–95. "The district court concluded that the evidence was insufficient to support any theory of [False Claims Act] liability against La Vie Management, as the evidence did not show that the management entity 'presented' or 'caused to be presented' a false claim." *Id.* at 1099. This Court reversed, explaining that evidence that La Vie Management routinely pressured employees to inflate billing records, reprimanded employees for failing to meet billing-amount goals, and instituted a policy of requiring management approval

to submit claims at the lowest billing amount satisfied the proximate-causation standard. *Id.* at 1108.

The same is true here. River Region d/b/a Alabama Psychiatry and its owner-operator Dr. Yalamanchili pressured Dr. Boodoo and other employees at the Riverview IPF to admit all Medicare-insured patients and deny admission to non-Medicare patients regardless of medical need, pushed them to keep patients admitted to the Riverview IPF as long as possible, forced them to use a billing template that induced upcoding, reprimanded them for failing to meet these orders, and, in the case of Dr. Boodoo, required that he obtain management approval before he could discharge patients. Per *Ruckh*, these specifically pled allegations are enough to plausibly establish that River Region, Alabama Psychiatry, and Dr. Yalamanchili caused false Medicare Part A claims to be presented.

*4. Scienter*

Finally, Dr. Boodoo plausibly alleged that the Riverview Defendants "actually knew or should have known that [their] conduct violated [Medicare] regulation[s]." *Phalp*, 857 F.3d at 1155. "At the pleading stage, 'knowledge, and other conditions of a person's mind may be alleged generally.'" *Matheny*, 671 F.3d at 1224 (quoting FED. R. CIV. P. 9(b)). And Dr. Boodoo's allegations of knowledge go far beyond the general. As Dr. Boodoo explained, Riverview management "consistently demanded that Dr. Boodoo admit Medicare patients to the Riverview IPF regardless of medical

necessity and retain patients for specific lengths of stay" and "instructed Dr. Boodoo that his admission and length of stay decisions should be dictated by patient insurance coverage." Doc. 40 at 45–46 (¶¶ 149–50). River Region and Alabama Psychiatry also knew of these fraudulent practices. Indeed, Dr. Yalamanchili—acting on behalf of both entities—repeatedly instructed Dr. Boodoo to admit only Medicare-insured patients and to keep them admitted as long as possible, even going so far as to tell Dr. Boodoo "we can just keep these people as long as we want and we can always make an excuse later and Medicare will have to pay us." Doc. 40 at 60–61 (¶ 199). And even after Dr. Boodoo told Dr. Yalamanchili that he thought Riverview IPF's practices were "illegal," Doc. 40 at 62 (¶ 203), River Region, Alabama Psychiatry, and Dr. Yalamanchili continued to engage in the same fraudulent conduct.

Because Dr. Boodoo pled each element of his § 3729(a)(1)(A) causes of actions plausibly and with specificity, they should have survived dismissal.

### *B. Dr. Boodoo plausibly established the use of false statements, in violation of § 3729(a)(1)(B), with specificity.*

For many of the same reasons why Dr. Boodoo established plausible violations of § 3729(a)(1)(A), he has also established a violation of § 3729(a)(1)(B), which imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." To establish this cause of action, "a relator must show that: (1) the defendant made (or

caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *Phalp*, 857 F.3d at 1154. These are essentially "the same elements" as a § 3729(a)(1)(A) claim: "the existence of a false claim or statement, the materiality of that false claim or statement, and scienter." *Gose*, 109 F.4th at 1309 (quoting *Yates*, 21 F.4th at 1298). The difference is that "false statement claims do 'not demand proof that the defendant presented or caused to be presented a false claim to the government or that the defendant's false record or statement itself was ever submitted to the government.'" *Id.* at 1309 n.14 (quoting *Hopper*, 588 F.3d at 1327). The district court missed this distinction, erroneously holding that presentment is a required element of a § 3729(a)(1)(B) cause of action and dismissing Dr. Boodoo's false-statement claim on this basis. Doc. 69 at 26–27. Under the proper analysis, Count Seven of the amended complaint—which alleges use of a false statement by all four Riverview Defendants—is established plausibly and specifically for the same reasons as Counts Two, Three, Four, and Five regardless of presentment.

First, the Riverview Defendants either made (in the case of Prime Healthcare) or caused to be made (in the cases of River Region, Alabama Psychiatry, and Dr. Yalamanchili) the statement that Riverview IPF provided services "in compliance with [Medicare's governing] laws and regulation." Doc. 40 at 21 (¶ 72). This statement was false, the Riverview Defendants knew that the Riverview IPF was

violating Medicare rules and regulations, and the violated Medicare rules and regulations were material to the government's decision to pay millions of dollars after receiving those cost reports.

Second, the Riverview Defendants knowingly made or caused to be made false statements that were material to the Medicare-paid claims for Patients D, E, and F. Dr. Yalamanchili, acting on behalf of Alabama Psychiatry and River Region, made false statements in the admissions documentation for Patients D, E, and F when he fraudulently certified that these patients had a qualifying psychiatric diagnosis and needed active treatment of an intensity that could have been provided only in an inpatient hospital setting. Doc. 40 at 53–57 (¶¶ 182–83, 187–88, 190). And Prime Healthcare caused these fraudulent statements to be made by its unrelenting pressure on Dr. Yalamanchili and other healthcare providers at the Riverview IPF to admit all Medicare-insured patients regardless of medical need. Because Medicare does not pay for inpatient psychiatric services without a valid certification from a physician attesting that the patient has a psychiatric principal diagnosis that requires active inpatient treatment, these false statements were material to the resulting false claims for Patients D, E, and F. App. 30 (¶¶ 62–63).

### *C. Dr. Boodoo plausibly established a reverse false claim, in violation of § 3729(a)(1)(G), with specificity.*

"To establish a reverse false claim, a relator must prove: (1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made,

used, or cause[d] to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation." *Matheny*, 671 F.3d at 1222. As was the case with the false-statement claim, the district court erroneously held that presentment is a required element of a reverse-false-claim cause of action when it is not. *Compare* Doc. 69 at 28 (dismissing because "the amended complaint does not allege with particularity the submission of any false claim, and as a result, it does not plead that Defendants received any payments based on those alleged false claims that they were obligated to repay to the government"), *with Matheny*, 671 F.3d at 1224 ("[F]or a reverse false claim action, presentment of a false claim is not at issue and presentment of a false statement is not required by the statute and thus, does not need to be pled."). Because many of the elements of a reverse-false-claim cause of action overlap with those of the false-claim and false-statement causes of action, for the same reasons discussed with respect to those claims, the Riverview Defendants knowingly made or caused to be made the materially false statements that Riverview IPF provided services in compliance with Medicare's governing laws and regulation and that Patients D, E, and F has psychiatric diagnoses that required active treatment in a hospital inpatient setting.

The key difference is that, unlike the causes of action for false claims and false statements—which target fraudulent efforts to *obtain* money from the government—

the reverse-false-claim cause of action arises from fraudulent efforts to avoid an obligation to *repay* the government. The repayment obligation must exist "at the time of the allegedly false statements." *Matheny*, 671 F.3d at 1223.

Here, Medicare regulations expressly demand that, if the hospital finds that it has received funds to which it "is not entitled" after conducting the "reconciliation" required when compiling the annual Form 2552 cost report, such "overpayment must be reported and returned" to the government "by the later of . . . 60 days after the date on which the overpayment was identified; or . . . the date [the] corresponding cost report is due." 42 U.S.C. § 1320a-7k. But to retain their ill-gotten gains, the Riverview Defendants did not report, much less return, the Medicare funds they received that they knew, or should have known, they were not entitled to—a misrepresentation of "plain and obvious materiality." *See Ruckh*, 963 F.3d at 1105.

### *D. Dr. Boodoo plausibly established a conspiracy, in violation of § 3729(a)(1)(C), with specificity.*

"To state a claim for conspiracy under the [False Claims Act], the plaintiff must show (1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Gose*, 109 F.4th at

1319 (quotation marks and citation omitted).[7] The amended complaint pleads each of these elements plausibly and with specificity.

First, the amended complaint described the alleged agreement between the Riverview Defendants to operate the Riverview IPF in violation of Medicare rules and regulations. The amended complaint explains that Riverview Regional Medical Center had a contractual arrangement with River Region, Alabama Psychiatry, and Dr. Yalamanchili under which they were paid to operate and provide physicians for the Riverview IPF. Doc. 40 at 43 (¶ 142). And it further alleges that Prime Healthcare officials made clear to Dr. Yalamanchili that the continuation of this contractual relationship with Riverview IPF depended on River Region, Alabama Psychiatry, and Dr. Yalamanchili's willingness to accept referrals of Medicare-insured patients regardless of medical need and to extend the stays of these patients for as long as possible to maximize the per diem fees that Prime Healthcare could collect from Medicare. Doc. 40 at 50–51 (¶ 172).

Second, the amended complaint detailed a litany of acts the Riverview Defendants took to further this conspiracy. As just one example, the amended

---

[7] This Court has questioned "whether damages remain a required element under the new conspiracy provision following the 2009 amendments" to the False Claims Act but has not had occasion to definitively resolve the issue. *United States v. HPC Healthcare, Inc.*, 723 F. App'x 783, 791 (11th Cir. 2018) (citing John T. Boese, *Civil False Claims and Qui Tam Actions* § 2.01(F) (4th ed. 2011)). Because Dr. Boodoo has plausibly and specifically pled damages to the United States, the Court need not reach the question in this case either.

complaint alleged specific instances when Dr. Yalamanchili admitted patients to the Riverview IPF who had no medical need for inpatient treatment and other specific instances when he kept patients admitted for no reason other than to maximize the recoupable per diem fees. Doc. 40 at 53–58 (¶¶ 181–92).

Finally, the amended complaint specified the damage caused to the government by this conspiracy: the millions of dollars paid to Riverview as a result of its fraudulent annual cost reports and thousands of dollars paid to Riverview for the fraudulent claims on Patients D, E, and F. App. 66–71 (¶¶ 185–94).

## III. Dr. Boodoo plausibly and specifically pled retaliation against River Region and Dr. Yalamanchili.

The district court dismissed Dr. Boodoo's retaliation claim against Dr. Yalamanchili and River Region on the basis that Dr. Boodoo was employed by Alabama Psychiatry—not Dr. Yalamanchili or River Region—and therefore neither Dr. Yalamanchili nor River Region "could have retaliated against him." Doc. 69 at 38. This is wrong as a matter of both fact and law.

First, the amended complaint alleged that Dr. Boodoo had been hired "by Defendant Dr. Yalamanchili—through Yalamanchili's entities River Region and Alabama Psychiatry." Doc. 40 at 42 (¶ 140). And discovery proved this allegation was accurate. Dr. Yalamanchili signed Dr. Boodoo's employment agreement for "River Region Psychiatry Associates, LLC," and the agreement itself said Dr. Boodoo was employed by "River Region Psychiatry Associates, LLC, dba Alabama

Psychiatry LLC." Exhibit B to Evidentiary Material in Support of Motion for Summary Judgment at 1, 18, *Boodoo v. Alabama Psychiatry LLC*, No. 2:23-cv-00460 (N.D. Ala. Nov. 8, 2023), Doc. 29-2.[8] He therefore had an employment relationship with each of them.

But even if Dr. Boodoo didn't have an employment relationship with River Region or Dr. Yalamanchili, each can still be liable under § 3730(h). Starting with River Region, it can be held liable because Alabama Psychiatry is the alter-ego or mere instrumentality of River Region. While this Court "has not addressed the issue of whether an entity can be held liable under the [False Claims Act] as an alter ego and/or integrated employer," such tests are regularly employed in the context of Title VII retaliation claims. *United States ex rel. Sheppard v. Pathway of Baldwin Cnty., LLC*, No. 17-cv-00355-KD-N, 2024 WL 3378386, at *5 (S.D. Ala. July 11, 2024).

As this Court has recognized for Title VII retaliation, under the "single employer" theory, "where two ostensibly separate entities are highly integrated with respect to ownership and operations, [a court] may count them together" as a single employer. *Peppers v. Cobb Cnty.*, 835 F.3d 1289, 1300 (11th Cir. 2016) (quoting

---

8 The Court may take judicial notice of Dr. Boodoo's employment agreement, which was filed by Alabama Psychiatry in support of its motion for summary judgment on Dr. Boodoo's retaliation claim. *See Lozman v. City of Riviera Beach, Fla.*, 713 F.3d 1066, 1076 (11th Cir. 2013) ("Although this matter is before the court on a motion to dismiss, we may take judicial notice of the court documents from [a separate but related] action."); *see also* FED. R. EVID. 201 ("The court may take judicial notice at any stage of the proceeding.").

*Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1341 (11th Cir. 1999) (en banc)). This theory would apply here given that Alabama Psychiatry and River Region share the same owner—Dr. Yalamanchili—and conduct their business together. And even if River Region and Alabama Psychiatry are not a single employer, River Region could still be found liable under a "joint employer" theory since "the business entities involved are in fact separate but [] they share or co-determine those matters governing the essential terms and conditions of employment." *Id.* at 1300 (quoting *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1360 (11th Cir. 1994)).

As for Dr. Yalamanchili, it is true that § 3730(h) usually extends only to the corporate entity or formal employer and not to any individual defendants, such as individual supervisors. But an individual supervisor who dominates and controls a defendant entity such that it benefits him personally may qualify as a *de facto* employer liable under § 3730(h). *See Mruz v. Caring, Inc.*, 991 F. Supp. 701, 710 (D.N.J. 1998). Given Dr. Yalamanchili's sole ownership of both River Region and Alabama Psychiatry, this exception may apply here. Accordingly, even if Dr. Boodoo had no contractual employment relationship with Dr. Yalamanchili or River Region (which he did), Dr. Boodoo should have been permitted to probe the relationship between Alabama Psychiatry, Dr. Yalamanchili, and River Region via discovery. *See, e.g.*, *United States ex rel. Rubar v. Hayner Hoyt Corp.*, 306 F. Supp. 3d 478, 484–58 (N.D.N.Y. 2018) ("Given the high-level of control, commonality of ownership, and

close relationship between [the defendants], and other reasonable inferences that can be drawn from this relationship, the court will not dismiss the retaliation claim . . . at this [motion-to-dismiss] stage.").

**CONCLUSION**

For all these reasons, this Court should reverse the district court's dismissal order and remand for further proceedings.

Dated: April 8, 2025

*/s/ Benjamin P. Bucy*
Benjamin P. Bucy
Chloé M. Chetta
Aaron M. Steeg
BARRASSO USDIN KUPPERMAN
FREEMAN & SARVER, L.L.C.

James F. Barger, Jr.
J. Elliott Walthall
FROHSIN BARGER & WALTHALL

*Attorneys for Appellant Ramnarine Boodoo*

## Certificate of Compliance

1. This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,199 words.

2. This document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Benjamin P. Bucy*
Benjamin P. Bucy

## Certificate of Service

I certify that on April 8, 2025, I electronically filed the foregoing brief with the Clerk of Court by using the Court's CM/ECF system, which will send a notice of electronic filing to all parties in the case who are registered through CM/ECF.

*/s/ Benjamin P. Bucy*
Benjamin P. Bucy